for the appellate, Mr. Young and Mr. Cross. Will you both be addressing the court? Yes, Judge. We agree to split our time. Very good. You may proceed. May it please the court, counsel, my name is Kelly Borden and I represent the respondent appellant Casey Zander. Today I present two issues for appeal. The first issue is that we believe that the trial court erred in not signing an entry in the agreed custody order that I had drafted. The second issue is we believe the trial court erred in allowing a change of custody such that the child went to Mr. Burnett. A brief summary of the facts, the parents in this case, Casey and Mike, were never married. Chance, the minor child, was born in 1996. Throughout the child's life, Casey Zander was the primary custodian of the minor child. During this time, until 2008 approximately, the parties somewhat got along, even to the extent that they would share holidays together at Ms. Zander's parents' house. He would have time at Christmas, he had pretty much the entire summer, time at Thanksgiving, and also time at Easter. In 2008, Mr. Burnett filed his motion for custody. It was at this time then that the negotiations between the parties broke down and the agreements that had previously been reached also had broken down with regards to the holidays. The following year that ensued with much litigation back and forth, even to the extent that Mr. Burnett filed a petition for rule of show cause with approximately 46 allegations, all of which we filed a response to and never had a hearing on that matter. Approximately towards the end of the negotiation and right before the trial in August of 2009, so a year later, Mr. Burnett came back with three positive cocaine tests. He had hair tests done, the hair test indicated that he was testing positive for cocaine. There were three tests that were done at this time and they all tested positive for cocaine. At trial, before we began the trial, Mr. Burnett agreed to keep custody the way it was. We also went through and had several agreements that were reached that day, August 17, 2009, that were spread of record. All of those agreements that were spread of record at that time then I drafted into an agreed custody order. After I drafted the agreed custody order, I filed approximately three motions to enforce that agreement. During that time, opposing counsel and Mr. Cross had indicated that the agreement did not contain all of the agreements. Specifically, my client had been married to a gentleman, Ben Affronte, and they believed that my client was still having some sort of relations with Mr. Affronte. They wanted something in the order that provided that there would be no contact between Chance and Mr. Affronte. Later, in the spring, it wasn't that Chance, my child, couldn't have contact with Mr. Affronte, but instead Chance couldn't be around when Mr. Affronte and Casey Zandrum were in the same room together. It was in the fall of 2009, right after, about a month or so after we had reached the agreement, spread it on record, that this came to a head. My client contacted Helen Appleton, which had done a custodial evaluation, saying that my client should maintain custody of the minor child. She contacted Helen Appleton. Helen Appleton wrote a letter or memorandum that said she did not see a problem with Chance continuing to see Mr. Affronte. In fact, she thought it was a positive relationship. She even went on to say that if, for some reason, Casey and Ben were going to maintain a relationship, then they should go to counseling because of the alleged domestic violence that had occurred. In order to reintegrate Chance into that relationship, there should be counseling. But as my client stated, even at the trial, Ms. Zander never went back and had a relationship with Mr. Affronte. What relationship did Appleton say was a positive relationship? Chance's relationship with Ben. And I'll back up. Ben and Casey had been married for almost all of Chance's life. Well, I shouldn't say that. They got married when he was fairly young. So Ben had been there. Ben was the one that stepped in the shoes of his stepfather and been there for Chance. So Helen was saying that from what she had heard Chance talk to her about with regards to Ben, that that was, in fact, a positive relationship. She even stated, quote, that she did not view Ben as harmful to Chance. So there wasn't a problem with Chance being with Ben. And my client stated that she was not with Ben anymore. But Ben and Chance maybe would play video games together or if she had to run to the store, Ben would come over and be with Chance. There was one time before Helen wrote her letter or memo that Chance wanted to go to, I believe it was Wisconsin, to a water park. I think it was in Wisconsin, Dallas. And so Chance took a friend and Ben and Casey went to the water park together, four of them, and spent the night in a hotel. Again, that was before Helen wrote the letter. Once Casey found out that she should go to counseling if she's going to reintegrate Casey, Ben, and Chance together, she didn't do that. Instead, she would take herself out of this situation. If Ben wanted to see Chance, if Chance wanted to see Ben, Ben would come over, she would leave. And again, so I drafted my order that contained all of the language that was contained in the transcript of the August 17th hearing. And then, like I said, I filed three motions to enforce that order. I'm going to kind of focus on the last one that I filed, which was on June 8th. But I have to back up to the one that I had filed previously. And we had a hearing on January 8th, this would be in 2010, where I presented it to the court. And at that time, as you see in the transcripts of that January 8th hearing, the court said it would not approve of any agreement that did not contain language that Ben would not live in the house together or be exposed to the three of them together. And even at that time, Mr. Cross agreed that it's not the relationship between Casey and Ben, but it was the relationship between the three of them together. Mr. Cross didn't have a problem with Chance seeing Ben either. It was the three of them together. And Casey, in her testimony, even said that at no time, at no time when we were discussing this, did she ever say that Chance would not see Ben. That was a given from the get-go when we were coming up with this agreement. There was nothing spread of record on August 17th that said anything about Ben whatsoever. If that was a reason of why they were agreeing, which it was not, it was because he tested positive three times for cocaine, then that should have been in the record. Someone should have brought that to the attention of the judge at that time. Nobody did. It was not until afterwards, and lo and behold, Mr. Burnett tests negative for cocaine, then in the spring of 2010. Meanwhile, I filed my motion to enforce. We have a hearing on that. The judge said, the trial court says that the only way it's going to enforce that agreement is if there's something in there that says Ben can't live in the house and the three of them can't be together. Specifically, the judge says, I will not approve of an agreement that does not include him not living in the house. With that in mind, in June of 2010, I filed another motion to enforce. Although we did not believe that we had to put anything in there about Ben, because it was not in there in August 17th, we acquiesced and we added the language that the court wanted and that we believed that the child's breath had wanted and that Ms. Liga, the attorney at the time, had wanted. Specifically, we put in the last one, that at no time shall the child be exposed to respondent and her former husband, Ben Affronte, together, except at drop-off and pick-ups of the minor child. That's the exact language that we had on January 8th in court. I added that language. There's more in that paragraph. Obviously, I won't go through that. But we went through it and I put in the language that the court specifically wanted in the agreement. That was the only reason that he gave on January 8th of why he didn't sign the agreement. We added it. After adding that language, we now had everything that was in the August 17th transcript in the order and we also had the language that the trial court wanted in the agreement as well as Mr. Cross and Ms. Liga at the time. As a result, that order should have been entered on June 8th at that hearing. Instead, the trial court denied my motion and said it. I believe it was already set for trial, so we had trial on that. What is the name of the legal theory that suggests that in a custody matter, the trial court is required to accept what appears to be the agreement of the parties? What is the legal doctrine that says the trial court must accept that? Well, I think in a custody issue, the trial court can or cannot accept the agreement. In fact, I believe the trial court can say even after we say... Then how can the trial court be compelled to enter an order that you want entered if the trial court is of the view that that is not in the best interest of the child or doesn't represent everything that needs to be considered? How can it be error to refuse to do that? Well, if I can back up. The court found on August 17th that it was in the best interest of the child and that it was the agreement of the parties. Like you said, I don't think the trial court has to accept that. But the trial court found that, yes, indeed, it was in the best interest of the child for custody to remain with Casey Zander. And then when we went back on January 8th, when I asked to file my motion after we had had hearings about Benefronte, and the court said it will not approve of an agreement without that specific language in it. Understood. I quit that language in it. But that August 17th of 2009, the court didn't enter any order. Correct. We spread the agreement, and he made a finding, not only in open court, but also in his DACA entry, that he found that agreement to be in the best interest of chance and that it was approved. Except that that's no longer the agreement. The agreement is changed both by circumstances and additions to the agreement, right? During 2010, circumstances changed, whether for the better or for the worse. There were some additional information available to the court, and you believe you added to the agreement that you wanted enforced those things that the court asked for and those things which seemed to concern the parties. Yes. And then that agreement, the trial judge says, no, I'm not going to enter it. Is that correct? I'm not going to approve it. I'm not going to enforce that order. He said that, yes. Our contention is nothing changed. Well, I want to know why he is compelled to enter the agreement. What is the legal doctrine or precedent that says a trial court who has continuing jurisdiction and is aware of either additional information or changes, your contention would be there were no changes, but there is additional information and additional considerations in part because of what's been added. What is it that requires, how can it be error for the court to say, I'm not going to enter that, I'm going to make the decision that I think needs to be made? I'm not being, I don't think I'm being obtuse. No, I mean, I understand what you're saying, but I... Somehow... To answer your question, no, I don't know of a legal theory or a legal case that would necessarily say that. However, if the court finds that it was in the best interest of the child and that it was a reasonable agreement... In August of 2009. Correct. And everything was spread of record on that day. And I know that counsel would come up here and say that they had no idea that Ben was going to be in Chance's life again. It would say that's just completely inaccurate and the testimony shows that that was inaccurate. So from that time forward, there was no changes. So the court found at that time that it was in the best interest. I don't think the court can go back now and say, oh wait, now it's not in the best interest even though nothing's happened. There's no motions that were on file after that asking for that agreement to be set aside. There was no evidence given. In fact, on January 8th when I asked the court, let me clarify, what are you basing on this? Because then all of a sudden it became my burden to show why the child shouldn't be in front of that. Let me clarify, judge, is that what you're asking to do? And he said at that time, yeah, he doesn't care whose burden it is. Keeping in mind, he didn't even have a hearing. There was no hearing. There had been no hearings. The only hearing that had been set was on this petition for order to show cause that the day of trial for that said, okay, we're not going to do it after we file our response. So no testimony had even been given in this case. And then when I asked the judge, well, what are you basing that on? He holds up the file and says all these allegations. Those were allegations. We had never had a trial. Yet then it turns on me that it's also my burden to come forward and show why Ben shouldn't be around the child. I don't believe that was correct. I think if there was a problem with Ben, the order should have been entered the way it was spread of record in August. And afterwards, if they had a problem with Ben or claimed that they didn't know Ben was going to be around the child anymore, there's appropriate remedies for that. They could have filed a motion to modify. They could have filed a motion to set aside the agreement. None of that was done. And then for the trial court to come back and tell counsel, oh, yes, there was an agreement, but because this paragraph or this language is not in there, I'm not going to approve of it. We asked. Okay, fine. We'll put the language in. We're jumping through the hoops. We put the language in and then still it's, no, I'm not going to approve of it. And I believe that that is error for the court to at one time say that it's in the best interest of the child and then to come back six months later after we add what the judge wanted us to add and then say, well, no longer it's in the best interest. Let's keep in mind at the same time here, all of a sudden Mike tests negative for cocaine. So it's no longer in the system, ready to go forward with trial. So in effect, for those six months, that gave him time to be able to test negative for cocaine, which was the basis of the agreement back in August. That's why we were there the day of trial and all of a sudden they wanted to settle and allow my client to have custody because he tested positive not once, not twice, but three times for cocaine. When we had trial then this year, this summer, he had negative drug tests. Well, of course, because that whole year went by with him complaining about the order, about the agreed order that they entered, that they agreed to back in August, to give him time to test negative for cocaine. Even assuming that the agreement doesn't get entered. We believe that the trial court erred in awarding custody to Mr. Burnett. One of the issues that the court used in changing custody was my client's not putting the child in counseling. I think if the court reviews the record, my client was the one that started the counseling when Mr. Burnett, after he would, for the previous four to five years, would change girlfriends every year prior to the summer so that every year during the summer, Chance was staying with a new girl because Mike had a new girlfriend. Mike didn't have his own house during these years. Mike instead would move from woman to woman and live in their house. My client had a concern about that and so towards the end of the school year in 08, got the child into counseling up in Wisconsin. Then when the child came back down here and there were allegations of abuse up in Wisconsin, she continued when he came back after the summer to try to get him into counseling. They agreed before she left to go see Brian Heatherton here in town. They did see Brian Heatherton in town for a couple of visits. Then when she went back to Wisconsin, she didn't get him in any counseling because it was understood that Mr. Panicki, who was the attorney at that time, wanted a custodial evaluation. We were waiting to find out who Heatherton was going to have us use up in Wisconsin because Dr. Heatherton wouldn't do it since he lived here. So during that time, she didn't get him into any counseling because we were waiting on that. When that fell through and then Rob Cross, who was the mediator at the time that then became the child rep, when he started, my client already had him in counseling. In fact, the same day that they had their first appointment was the same day that Mr. Cross wrote a letter and said Chance needs his own counseling. So then she changed that counseling because that counseling was originally between the counselor, her, and the child just to work on some homework issues and the custody battle. She changed that and she made it just for Chance. Then Chance went, that was Liz Barthel, and so then Chance went to Liz Barthel and then came back here for the summer. I think towards the end of that school year, Liz Barthel was a graduate student and left so went to another counselor. Then when we came back after the summer of Chance being in Springfield, put him back in to see Diane Schultz, the previous counselor, but she had problems getting him in because she only saw kids one day a week. So then she was able to get into another counselor, a psychiatrist, Dr. Cody, and informed Mike of that, gave my dates, this is who I'm going to use now, here's some dates, which one can you do. He picked the latest one, November 24th, so then he wasn't in counseling for about two months, although he was still seeing the school counselor. And he continued to see Dr. Cody during this time. So to say that my client wasn't having him in counseling, she's the one that started it and tried to continue it. I see my name is over. We'll hear from you on rebuttal. Thank you. May I please support counsel? My name is Jason Young and I represent the petitioner of Pele, Mr. Burnett. With regard to the enforcement of the agreement that was spread on August 17th of 2009, that agreement was never final. Supreme Court Rule 272 implies that the time between the announcement of a final judgment, which the court did enter or did approve of the agreement at that time, and then requires the submission of a written order, during the time between the announcement of the final judgment and the signing of the written order, case law seems to indicate that the proceedings are in a temporary state of abeyance, the oral pronouncements are neither binding nor appealable, meaning the court is free to alter its judgment at any time after that by its own motion or the motion of the parties. In this case, there was an agreement spread of the record on August 17th, 2009, and there was no mention of Mr. Affronti. That was because it was the understanding of all the parties that he was completely out of the picture. A little over two weeks before that agreement was spread of the record, Ms. Zander was deposed pursuant to this case and indicated in that deposition that she was divorcing him and he was no longer in the picture. That was everyone's understanding. Shortly after the agreement was spread of the record and before it was signed by the judge, facts came to light that she was continuing a relationship with Mr. Affronti. That concerned not only the petitioner but the child representative and the court. At a hearing in which the respondent attempted to enforce the agreement of August 17th, as she had stated a moment ago, the court specifically said, with Mr. Affronti back in the picture, which she admitted at that time he was, she was back continuing a relationship with him, with him back in the picture, the court was not going to approve any agreement that had him in a continuing relationship with the respondent. He specifically stated further that if he was going to even consider approving any agreement with him in the picture, he would require presentation of evidence to determine that it was in the child's best interest. A moment ago, counsel was indicating, as Justice Connett pointed out, that they had added language to the August 17th agreement and tried to enforce that. That agreement was never approved by the court. They were fundamentally changing the agreement that was spread of record on August 17th by adding language to it at a later date. There's no legal doctrine requiring the court to enforce that agreement. Counsel argued, though, that the language added was the precise language that the court had requested. The court didn't specifically request language. It said that it didn't want him in the picture. And if it was going to approve of any agreement that had him in the picture, it would require presentation of evidence that it was in the child's best interest that that agreement be entered. Isn't the problem here that on August 17th, 2009, everybody came to court and said, we have an agreement. The agreement is spread of record. The trial judge says, I'm going to approve this agreement, and I find that it's in the best interest of the child. And then the written order doesn't get entered for a variety of reasons. And what he's saying is, well, I'm not going to sign that order. But everything was agreed to on that day, basically, and he approved it. Wouldn't the proper procedure have been for him to go ahead and sign that order? Because it reflected what actually happened on August 17th. And then if the circumstances had changed between that time and the time the written order was being entered, your client would have the opportunity to file. But the problem is, the burden of proof shifts to him. He's got to come to court then and show serious endangerment to get a change, doesn't he? But I don't think that the proceedings had ever reached that point, because case law indicates that the order isn't final until the judge signs it. And in this case, the judge never signed it. The McWhite case specifically says, and this court approved it in Pugsley v. Hanford, that a judgment isn't in the meantime between the approval of an agreement or a final oral pronouncement and the signing of the order. The proceedings are temporarily, for lack of a better word, put on hold. And the judge can alter its own prior ruling up until the point where he signs that written order. The fact that the written order was never signed, I think, indicates that it had never reached the point where things would have to follow the standard change in circumstances. Were you trial counsel? I was not. Do you know what remained pending other than the entry of what was assumed to be the agreed order? It's my understanding that the agreement had to be signed. But what else remained between the parties to be resolved, either by litigation or agreement? At the time that the agreement was entered, or spread of record, everyone understood the circumstances to be one thing. And then in the meantime, they realized that things had changed. You're not answering my question. Were there any issues other than custody visitation that kept this case alive? Or was it everyone's expectation that, assuming the agreement reflected the present state of affairs, that that was going to be the end of this litigation once that order was entered? To be honest, having not been there, I do not know. But I do not believe that there was anything that was pending. Anything else pending? That is correct. So did the trial court set case management conferences to just prod the parties along to get this order signed? My understanding was the judge had set a hearing date for the presentation of the written order with parties present. And in the meantime, between August 17th and that date, all these circumstances had changed and all this information had come to light regarding her ongoing relationship with Mr. Affronti. In what way did that come to the trial court's attention? What evidence did the trial court have? At a subsequent hearing, it was informed to the court that there was no longer an agreement and that there was this fundamental change in that agreement. And then Judge Nardulli asked the respondent at that hearing if there was an ongoing relationship, and she indicated yes, that there was. Is there anything in the agreement that was spread of record related to Ben? Not that I noticed. May it please the court and counsel, my name is Rob Cross. I was the child representative in this case. Let me answer Judge Connacht's question first. The only outstanding issue, as I recall, the day the agreement was spread of record, was the determination of an arrearage in child support. And I believe that Ms. Gordon had a proposal for the amount of arrearage, but Mr. Panicki wanted to do a calculation on his own. I think that was it. During the period from August until about October and November, what changed? Two things changed. The representations Ms. Zander had made to me, the child representative, to the custodial evaluator, and in her deposition that Mr. Affronte was gone, clearly turned out not to be true. She admitted this in her testimony at trial this last summer, that that was not true. She also admitted that she did not feel the need she had to tell anybody this. It was none of their business. This is at the time when these issues were pressing. As you all know, the court hearings don't take place in a vacuum. There are letters back and forth and emails like, what's going on here? Is Mr. Affronte around? Is he not around? If I could step back for a second, I want to talk about one thing Ms. Gordon mentioned, which was the alleged domestic violence. I don't know how alleged this is. We had testimony from Ben Affronte's parole officer in Wisconsin, from an evidence step, that had a report in his parole file where Ms. Zander had signed off on it, saying that there had been an incident of domestic violence. She had, Ms. Zander had told, she later said at trial, she thinks that document that she signed was altered. I don't know how it was altered. She also told the custodial evaluator that the child had experienced some fights between her and Mr. Affronte. The child told the custodial evaluator that he had come in and Mr. Affronte was bleeding, and there had been, right after a fight, and that that blood was not Mr. Affronte's. Judge Narduli was extremely concerned during the course of this matter about the relationship between Ms. Zander and Mr. Affronte. Ms. Gordon is correct that the fear was that the child was going to be around these two together. And between August and, I guess, beginning in November, it became apparent that this was happening, that the child was around. And Ms. Gordon is absolutely correct. This was not in the agreement, but it was not in the agreement because every time the issue came up, whether it was with the evaluator, with me, or in the deposition, the response was, it's over, there is no relationship. He's gone, we're divorced, or we're getting divorced. We couldn't really tell. First it was, we are divorced, and then we were getting divorced. So the alleged domestic violence was very real. It wasn't alleged. Okay, let me ask another question. Also, during the period between August and October, November, you're suggesting there was a change in circumstances which both you as the child's representative and perhaps other counsel became aware of. That's correct. Did you make the court aware of that? We did at the case management conference. And that would be simply by discussion and representation, not by the presentation of any evidence? That's correct. At the same time, was there a petition to modify custody on file and pending until the agreed order might be entered? There wasn't. There wasn't? There was not. There was not. And the reason there wasn't is because at that time, and I think the judge's statements at hearing reflect this, we were trying to get an order that everybody could live with based on everything we knew. So at the case management conferences, as you can imagine, the judge would ask us, what's the hang-up? Well, the hang-up is we have to get language regarding bene frontia. We have to get language regarding counseling. I don't want to let go of the counseling either, because that was a big deal. The child had counseling for two reasons. He had some serious health conditions that he needed counseling for that were health conditions he had directly affected him as he was entering his adolescence. But he also needed counseling for the domestic violence issues. To say that the mother had participated willingly in counseling is a stretch. She did get the child involved in counseling, but attended the counseling with him, which wouldn't work, because the child would probably in counseling have to talk about his mom and Mr. Affronti. In the year between August of 2009 and the trial, or the 11 months, she took the child to four sessions, a total of two hours of counseling, with someone who later, and I think it's in the record, Dr. Cody, admitted there was no counseling going on, and she was present the entire time. Counseling was key, and everybody agreed with the child. Again, part of it was for medical reasons. Everybody agreed they should go to counseling, and for the domestic violence. That's what needed to be in the agreement. And until just before, literally just before the trial, the mother was refusing to sign those agreements anyway. And that's why I think on January 8th of 2010, Judge Narduli, and I think he under Section 502 of the Illinois Marriage and Dissolution of Marriage Act, doesn't have to approve any agreement regarding children, even if the parents both come to him and say, we want this. Well, at this point in time, you have one parent and the child representative, by that point saying, this isn't it. But he had approved the agreement back in August. Whatever the agreement was, he said, I do approve it, and I find it's in the best interest of chance. He did, but the case cited by the father, this McWhite case, and I understand that it's a First District case, but it says the trial court's oral approval of terms of the settlement agreement are not binding on the parties. And so the father was saying, no, this isn't right. And I was saying, this agreement that was written up does not cover it. And by that time, again, does not cover the whole situation, because one of the, and that's why in my brief I talk about fraud, the mother had represented to us all along, especially in the summer of 2009, that Bishara Fronti was gone. This is a non-issue. And when that turned out to be demonstrably untrue, then we didn't have an agreement anymore. That was the center of the agreement. That was one of the fathers, in my opinion, his only real argument for the modification of custody was that the mother is exposing the child to domestic violence and not seeing it. But that was not spread of record. But it was not spread of record, because we documented, everybody had been told that he's gone. He is gone. And I understand that it seems like a huge oversight this far later, but it was that severe. I mean, it was a non-issue. Did the divorce occur then in September 2009? September or October, it was not done until after the agreement was spread of record. I'll tell you, it was so certain that this person was gone, that the custodial evaluator didn't even need to interview him. That's how certain it was. The question you asked, previous counsel, Judge Pope, was that, wouldn't the proper way to do it is enter the order and file a motion to modify? I do think, probably procedurally, that might have been a more correct way to proceed. But we're heading towards the exact same result. Because if under 502, Judge Narduli doesn't have to enter this order, and he clearly doesn't have to enter an order based on an agreement between parents who say this is in the best interest of the father. That's not just a ministerial act? It is not, not with regard to children. 502, I think, says... Isn't that what this court said, though, in Zander? That it's a ministerial act? It does. But Zander, I believe that case, the court had entered an order after hearing evidence saying this is the ruling of the court. And then it was left to the attorneys, or one of the attorneys, to write that order up.  Maybe right after the trial, and then left it to someone else, one of the attorneys, to write it up. But by January, when we were arguing about bene fronte and counseling, I don't think Judge Narduli had any requirement to enter that order. He could have. He could have and said, hey, file a motion to modify. Well, it would have reflected what he ruled in August based on the facts he knew then. And what I think the problem is, is under the statute, once that order was entered, burdens of proof shifted. Who has to go forward? So it matters. I think that's Gordon's position. It matters. She may be right, but when we had a trial last summer on this issue, it was entirely Mr. Burnett's burden on a motion to modify. It would not have been a different pleading or set of allegations. It's the same allegations that were filed, I believe, in August of 2008. But to change a custody order within two years of the entry, it's a little higher burden, isn't it? It is a higher burden, but I think his order addresses that. I mean, Judge Narduli's order, I think, addresses the six, ten factors that the child is – the serious endangerment factors. I think his order says the mother's historic – it's not just that there was domestic violence in her house. Her denial of it, her refusal to acknowledge it. When she was asked at hearing, was your son upset by seeing this? Her response was, what do you mean by upset? She was not acknowledging. She wouldn't acknowledge a document that she signed and that the probation officer testified in an evidence deposition days before was accurate. This isn't just that there's domestic violence. It's domestic violence that she doesn't acknowledge. Let me ask you a question again. I asked specifically about August 2009 to October, November 2009. Was there a motion to modify pending? And you said no. And then a few moments ago, you made reference to the motion to modify that was filed in August of 2008. And what I want to know is, was that still out there? Or did that get dismissed, abandoned in the second motion to modify file? No. You're right. I didn't answer that. The motion to modify, except for the fact that there was – one of the attorneys was going to look at the arrearage, child support arrearage, would have been satisfied by the order spread of record on the 17th of August. If the order was entered. If the order was entered. And it wasn't. If it's not entered, for whatever reason, then the petition to modify is alive and well. Absolutely. And that's one of the things we're here on. Absolutely. That's exactly right. The one that knew it. That's right. It's the one that was pending. I believe that. So everybody was on notice unless an agreement was reached. I mean, I'm thinking out loud. Was everyone on notice unless an agreement was reached? There appeared to be an intention on the part of the father to go forward on the modification. That is absolutely right. Okay. And was the petition to modify that was filed in 08, was it based on the domestic violence issues? He had a number of allegations, and my thought all along was, and my thought certainly at trial, was the main allegation was the continuing relationship with Mr. Affronti and the existence and denial of domestic violence in the mother's household and the child's exposure to it. Okay, but that was part of the basis for the original petition to modify. That's what I'm getting at. And no other petition to modify was ever filed. When you guys went to trial in January of 2010, that's the petition that was heard? June 2010. Yeah, June 2010. That's correct. That's correct. So I respectfully request the Court to hold the decision of the trial court. Thank you. Ms. Gordon, rebuttal, please. I'd like to quote from the January 8 hearing, which is one of the hearings that led to me making the final change to the agreement with regards to Mr. Affronti. The Court stated on page 8, I don't care whose burden it is, I'm going to hear testimony about it. I'm not going to approve an agreement that contemplates he's going to be in the house. I stated, okay, and again, so I can clarify, you're saying in the house. So you're not saying that he doesn't have a relationship with the child, just that he can't be in, and then Mr. Cross cut me off. Sorry, Mr. Cross then stated, I don't think anybody's saying that Mr. Affronti and the child can't have a relationship. What everybody's saying is the child can't be around, and even Dr. Appleton, the child can't be around Ms. Zander and Ms. Affronti for anything other than drop-off and pick-ups. And then the Court said, at the same time, Mr. Cross says, yes, at the same time. Ms. Lika, Mr. Burnett's counsel, said, and just, yes, judge, that is our position as well. That was the hearing on January 8th. After we had that hearing, I took the order, I added what counsel, Ms. Lika, wanted in it, I added what the judge wanted in it, and I added what Mr. Cross wanted in it. At that time, that was the only thing holding up the agreement of August 17th, was that language about Mr. Affronti. I added that language. And I believe since I added that language, the Court should have approved of it, as it was, as he had previously said that it was in the best interest of the child back in August. The judge then was saying that the only thing that wasn't now in the best interest was that the child and Casey and Ben be together as one. It was the only thing that was holding up that order. I made that change. Do you agree or disagree that the parties at Case Management Conference, and perhaps reference was made to it in January, made the Court aware that there was still ongoing contact and a relationship between your client and her ex-husband, and that when that order was to be entered in August, there was an assumption that there was no ongoing relationship or connection? Did I phrase that? If I can. Because I think it's really specific what language we use when we're talking about this. There's different relationships. My client divorced Mr. Affronti. My client said she was done with him. She was not going to have a relationship with him. Throughout the proceedings, she has said she's not going to have a relationship with him. She doesn't have a relationship with him. They shouldn't have a relationship with him. It was Chance and Ben, apart from Casey. That's even what the Court said. It wasn't, I'm sorry, what Dr. Huppleton said. It's not Chance and Ben being together. That wasn't the problem. And I understand that point. Do you then dispute that the father's lawyer and the child's representative became concerned, made reference to the fact that they thought either they had been misled, or it appeared that in October, November, there was still the kind of contact between your client and her ex-husband, by now ex-husband, that they didn't think was going to occur. I mean, was that brought up at the case management conference? Yeah, that's why the judge was making the references about that, because Mr. Cross had brought it up. Then at the time the agreement was made, this was even overlooked? Somebody misled somebody? No, I do not believe so. As Ms. Zander testified in trial, she made everyone in that room aware. And I will say, I don't know if Mr. Cross was in the room at the time that counsel was in there with the parties. She made everyone aware in there. Ben was still going to be in Chance's life. As she says in her testimony, no one said one thing about it. About, well, we have to put language in, or we have to do this. I mean, if you look at the agreed order, we had a lot of language in there, going back and forth with counseling. But I did not take what Mr. Cross said to me as a concern about him somehow still being involved with Chance. I took what he said to me to mean that your client had continuing relations with her ex-husband that were different than pick-up and drop-off. Oh, he may have made that allegation, but that's incorrect. There was no testimony to that. My client was not. I thought there was some statement in the trial court that your client agreed he was back in her life somewhere along the line, or you agreed to that. I believe on January 8th, I was cut off. I don't know if I, well, I'm out of time, but I believe there was someone that had said, is he back in her life? And I said, yes, and then someone said something right after I did. But at no time went back in Casey's life were they having any sort of relationship. It was Chance and Ben. Casey had divorced him and moved on. It was Chance and Ben. So your answer, yes, if you had not been cut off, yes, he's in the picture, and then he maintains a continuing relationship with Ben, or we want him to? With, yeah, Chance. Or with Chance. Exactly. Yes. Thank you. We'll take the matter under advisory.